**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| DARRIS L. LUMPKIN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | Case No. 06-CV-684 -GKF-FHM |
| UNITED RECOVERY SYSTEMS, L.P. ) | |
| formerly United Recovery Systems, Inc., ) | |
| ) | |
| Defendant. ) | |

**O P I N I O N   A N D   O R D E R**

This matter comes before the court on the motion for summary judgment [Doc. No. 67] of defendant, United Recovery Systems, L.P. ("URS"). For the reasons set forth below, defendant's motion is granted.

Plaintiff, Darris P. Lumpkin, a former employee of defendant, was terminated from his employment on December 2, 2004. Plaintiff asserts six causes of action: (1) race discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.* ("Title VII"); (2) hostile work environment in violation of Title VII; (3) retaliation in violation of Title VII; (4) hostile work environment in violation of the Civil Rights Act of 1991, 42 U.S.C. §1981; (5) retaliation in violation of 42 U.S.C. §1981; and (6) race discrimination in violation of 42 U.S.C. §1981.[1]

Defendant has moved for summary judgment arguing, (1) Plaintiff should be judicially

---

[1] The standards to be applied in evaluating discrimination and retaliatory discharge claims brought under 42 U.S.C. §1981 claims are the same as those applied in actions brought under 42 U.S.C. §2000e *et seq. See Wilson v. Legal Assistance of North Dakota,* 669 F.2d 562, 563-64 (8th Cir. 1982); *Bryant v. Aiken Regional Medical Centers, Inc.,* 333 F.3d 536, 543 (4th Cir. 2003), cert. denied 540 U.S. 1106.

estopped from bringing his claims; (2) Plaintiff's racial harassment claims under Title VII and §1981 fail as a matter of law; (3) Plaintiff's race discrimination claims under Title VII and §1981 fail as a matter of law; and (4) Plaintiff's retaliation claims under Title VII and §1981 fail as a matter of law.

## I.  Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  When applying this standard, a court must examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.  *Wolf v. Prudential Insurance Co. of America*, 50 F.3d 793, 796 (10th Cir. 1995).  The movant for summary judgment must meet the initial burden of showing the absence of a genuine issue of material fact, then the nonmovant bears the burden of pointing to specific facts in the record "showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  *Id*.

## II.  Undisputed Facts

URS provides collection services for its clients and employs approximately 200 individuals at its collection facility in Tulsa. [Doc. No. 67, Statement of Undisputed Fact. No. 1; Doc. No. 73, Plaintiff's Responses to Defendant's Statements of Undisputed Fact No. 1].  URS collectors contact consumers by phone and work accounts to negotiate settlements and payment arrangements with consumers. [Doc. No. 67, Statement No. 2; Doc. No. 73, Statement No. 2]. URS pays collectors a salary and, based on amounts an employee collects each month, a

commission. [Doc. No. 67, Statement No. 3; Doc No. 73, Statement No. 3].[2] Collectors are assigned different types of files categorized as "A," "B," "C," and "D." Generally, "A" and "B" files are more desirable than "C" files. The "D" files are not assigned to employees. An employee's performance has the greatest effect on the files he or she is assigned and collectors are also moved to different files as the number of files in each file category fluctuates. [Doc. No. 67, Statement No. 4; Doc. No. 73, Statement No. 4]. Collection on new files is generally easier than on old files. URS had a computer system that automatically dropped the new accounts in collector's files each morning. The collector would not start receiving new accounts until they were logged onto the computer; therefore, if an employee was late to work, he or she would risk losing the opportunity to work new accounts. [Doc. No. 67, Statement No. 5 and Ex. A, Affidavit of Sean Dickson, ¶14 ; Doc. No. 73, Statement No. 5].

Plaintiff was hired by URS as a collector on November 26, 2001. [Doc. No. 67, Statement No. 5; Doc. No. 73, Statement No. 5]. Plaintiff's salary during most of his employment was approximately $2,100 per month. He also earned commissions on collections over $6,666 per month, the amount URS characterizes as his "break even" number for salary, benefits and overhead. [Doc. No. 67, Statement No. 7; Doc. No. 73, Statement No. 7].

From December 2001 through March 2004, plaintiff received numerous "write-ups" and warnings for tardiness and attendance issues, and in September 2003, his commissions were cut by five percent because of these issues. [Doc. No. 67, Statement No. 8; Doc. No. 73, Statement

---

[2]At URS, collectors are expected to collect money "well in excess" of their salary and cost to the company, known as a "break even" number. [Doc. No. 67, Statement No. 3]. Plaintiff denies this, although he submits no evidence in support of his position. [Doc. No. 73, Statement No. 3].

No. 8].[3] Plaintiff admitted in his deposition that his tardiness was due to his own lack of discipline. [Doc. No. 67, Statement No. 9; Doc. No. 73, Statement No. 9]. In September 2003, as a result of changes in volume levels of files, plaintiff and two other employees (both Caucasian) were moved from "A" files to "B" files. Plaintiff admitted in his deposition this change was not related to his race. [Doc. No. 67, Statement No. 10, Ex. B., plaintiff's deposition, p. 84, l. 6 - p. 86, l. 16**;** Doc. No. 73, Statement No. 10].[4]

On March 28, 2004, plaintiff suffered a knee injury during a company softball game. As a result of this injury, plaintiff had knee surgery and was off work during April 2004. [Doc. No. 67, Statement No. 11; Doc. No. 73, Statement No. 11]. While at the hospital for his knee injury, plaintiff expressed financial concerns to URS Regional Manager Sean Dickson. Plaintiff had filed bankruptcy in 2002 and was worried about finances for his family if he was not working. [Doc. No. 67, Statement No. 12; Doc. No. 73, Statement No. 12]. Dickson and other employees visited plaintiff in the hospital on several occasions. Because of his financial problems, Dickson and other employees gave money to plaintiff to assist him. Dickson gave plaintiff $300 of his own money. Larry Newland, another manager, visited plaintiff in the hospital and took him a

---

[3] Specifically, plaintiff was written up for being late to work 18 out of 22 days in February 2003, and was warned in July 2003 that any further tardies would result in a commission split change. [*Id.*] In October 2003, his manager wrote: "Darris has been warned on numerous occasions about his tardies; they are inexcusable. Darris is expected to be here on time every day. One more tardy in the next 30 days will result in further disciplinary action, up to and including termination. We have to be fair and consistent, Darris has been given too many chances..." [*Id.*] In December 2003, his manager wrote, "your tardies are getting worse. We have had this discussion too many times–THIS HAS TO STOP!" [*Id.*].

[4]Plaintiff alleges the reassignment was retaliatory in nature; however, the change took place before plaintiff ever lodged any complaints of racial harassment. [Doc. 67, Statement No. 10, Ex. B, p. 84, l. 6 - p. 86, l. 16].

Game Boy and a video game. Other co-workers chipped in and gave plaintiff approximately $725.50 in cash. [Doc. No. 67, Statement No. 13; Doc. No. 73, Statement No. 13].

Plaintiff returned to work on May 10, 2004, but because of his knee injury and medication for diabetes, he requested and was permitted to work a reduced schedule. [Doc. No. 67, Statement No. 14; Doc. No. 73, Statement No. 14]. He was paid his full salary. [Doc. No. 67, Ex. K, Affidavit of Gerald Fritz, ¶6]. When he returned to work following knee surgery, plaintiff began reporting to manager Gerald Fritz. [Doc. No. 67, Statement No. 15; Doc. No. 73, Statement No. 15]. In the two months following his return to work, while working a reduced schedule, plaintiff had only one absence. He had collections of $7,506.79 in May 2004 and $12,877.57 in June, thus exceeding his "break even" number both months. [Doc. No. 67, Statement No.16; Doc. No. 73, Statement No. 16]. In the following months, plaintiff's collections declined to $7,957.89 in July, $7,095.65 in August, $5,923.55 in September and $1,642.41 in October 2004. [Doc. No. 67, Statement Nos. 17-20; Doc. No. 73, Statement Nos. 17-20]. On November 17, 2004, Fritz gave plaintiff an Employee Warning Notice with stated:

> Your performance must drastically improve. Failure to meet profitability standards could result in further disciplinary action up to and including termination. I want to offer you assistance either from John Harrison or myself that can help you meet and exceed your goals.

[Doc. No. 67, Statement No. 21; Doc. No. 73, Statement No. 21]. After receiving the warning, plaintiff elected to take vacation. He was expected back from vacation on November 22, 2004, but failed to show up, stating that he was stuck in Texas because of car trouble and rain storms. He committed to be back to work on November 24, 2004. However, he called the office on November 24 to say he would be late. He did not show up until after the office closed at 4 p.m. for Thanksgiving. [Doc. No. 67, Statement No. 22; Doc. No. 73, Statement No. 22]. The

following Wednesday, December 1, 2004, plaintiff failed to report for work; instead, he called the office and told Fritz his daughter was ill with a respiratory virus. [Doc. No. 67, Statement No. 23; Doc. No. 73, Statement No. 23]. On December 2, 2004, URS terminated plaintiff's employment. [Doc. No. 67, Statement No. 24; Doc. No. 73, Statement No. 24].

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") in June 2004. The General Intake Questionnaire was signed by plaintiff on June 14, 2004 and filed on June 24, 2004. [Doc. No. 73, Statement of Uncontroverted Fact No. 26; Doc. No. 75, Ex. A]. The charge was perfected September 2, 2004, at which time URS became aware of it. The charge alleged race discrimination and retaliation based upon the time period from January 23, 2004 through March 23, 2004. [Doc. No. 67, Statement No. 25; Doc. No. 73, Statement No. 25.] After an investigation, the EEOC on September 20, 2006, issued a Dismissal and Notice of Rights, concluding that the information provided had failed to establish statutory violations. [Doc. No. 67, Statement No. 26; Doc. No. 73, Statement No. 26].

Plaintiff's claims of hostile work environment are based on alleged statements made in 2004 by Brian Perkins, Larry Newland and Sean Dickson. [Doc. No. 67, Statement No. 27; Doc. No. 73, Statement No. 27 and Plaintiff's Statements of Uncontroverted Fact, Nos. 6-15.] Plaintiff's claims of discrimination and retaliation are based upon the termination of his employment with URS. [*Id.,* Doc No. 36, Second Amended Complaint].

Brian Perkins was a URS collector and manager from July 2002 until February 2004. [Doc. No. 67, Statement No. 27, Ex. U, Affidavit of Brian Perkins, ¶2; Doc. No. 73, Statement No. 27]. He was never plaintiff's supervisor. [Doc. No. 67, Statement No. 29, Ex. U, ¶2; Doc. No. 73, Statement No. 29]. Perkins and plaintiff had done collection work together at another

6

collection company before their employment at URS.[*Id.,* Ex. U, ¶3].[5]   Plaintiff claims Perkins made racially inappropriate statements to him.[6]   Plaintiff never reported the statements to URS. [Doc. No. 67, Statement No. 31; Doc. No. 73, Statement No. 31].[7]

Larry Newland worked as a collection manager for URS from April 1999 until June 2004.  [Doc. 67, Ex. J thereto, Affidavit of Larry Newland, ¶2.]  He had worked with Darryl Lumpkin previously at Commercial Financial Services ("CFS"), another debt collection company.  [*Id.*].   Newland was plaintiff's manager from late 2002 or early 2003 until sometime in the spring of 2004.   Plaintiff complains that Newland directed racial jokes and remarks at

---

[5] Perkins contends he and plaintiff were friends, joked around together on smoke breaks and hung around together outside of work at the Southern Hills Bar. [Doc. No. 67, Statement Nos. 28-29].  Plaintiff only admits that the two knew each other and states, "Plaintiff cannot say whether or not any joking with Perkins was 'constant.'" [Doc. No. 73, Statement Nos. 28-29].

[6] Specifically, plaintiff alleges Perkins claimed to be the Grand Wizard of the KKK and the "Up with Trees" signs on the highway were the group's plan to bring back lynching.  Later the same day, Perkins pointed at a tree and said, "Yeah–this tree will hold a big boy like you..." Also, plaintiff alleges that Perkins saw plaintiff's wife, who is also African American, dropping him off at work and said, "...You know why I won't take Black women to a hotel?  The bitch gave me the crabs, and the ho tell everybody."  Plaintiff contends he complained about both incidents. [Doc. No. 73, Plaintiff's Statements of Uncontroverted Fact Nos. 6, 9, citing Plaintiff's Affidavit, Ex. 1 thereto].  It is abundantly clear from the record that Perkins and plaintiff had what might best be described as a "give and take" joking/kidding relationship.  Plaintiff kidded Perkins about his small stature and at one point, picked Perkins up, carried him to a car, placed him on the hood and joked that Perkins was no bigger than a hood ornament. [Doc. No. 73, Affidavit of Brian Perkins, Ex. U, ¶6.  On at least two occasions, plaintiff put a white paper cone with holes for eyes cut in it, giving it the appearance of a KKK hood,  on Perkins' chair/desk area.  The words "Uncle Cracker" were written on at least one of the cones. [*Id.,* Ex. U,  ¶11]. At a work Christmas gift exchange, plaintiff gave a t-shirt to Perkins that had a photo image of a sperm with Perkins' face on it.  The front of the shirt referenced "Who's your daddy," and the back said "Brian Lumpkin."  Perkins thought the t-shirt was funny and done in good-hearted fun and believes the small group of c-workers did, as well. [Doc. No. 67, Statement No. 30; Doc. No. 73, Statement No. 30].

[7] Plaintiff contends in his deposition that he tried to report the statements to Sean Dickson and Doug McCann while complaining about Newland, but never had a chance to bring it up. [Doc. No. 67, Ex. B, p. 142, l.7 - p. 143, l. 25].

7

him.[8]  In March of 2004, plaintiff sent Doug McCann, Manager of Career Development Resources for URS, an e-mail complaining about racial remarks Newland had made to him. [Doc. No. 67, Statement No. 35, Ex. V, Affidavit of Doug McCann; Doc. No. 73, Statement No. 35].  McCann investigated the complaint.  Newland admitted making a remark, and was suspended for three days without pay. [Doc. No. 67, Statement No. 36; Doc. No. 73, Statement No. 36].  Plaintiff admitted in his deposition that after the incident, Newland made no further racial remarks to plaintiff. [Doc. No. 67, Statement No. 37; Doc. No. 73, Statement No. 37].

Sean Dickson has worked for URS since 2002 and, as regional manager for its Tulsa facility, manages all Tulsa employees.  [Doc. No. 67, Ex. A, Affidavit of Sean Dickson, No. 2]. In September of 2004, Dickson received a call from a tenant in the same building occupied by URS, complaining about "hoods" in front of the building.  When he went outside, he saw plaintiff and another URS employee, Brian Redmond.  Dickson shared with them that a tenant complained and (in his testimony, jokingly) commented that "you hoods need to come inside." Plaintiff complained about the incident to McCann. [Doc. No. 67, Statement No. 38; Doc. No.

---

[8]Plaintiff contends that Newland told him racial jokes about Stevie Wonder, slaves and facial features of Ethiopians and called plaintiff "Smiley" and "Koonta" two or three times a day over a 60-day period.  [Doc. No 73, Plaintiff's Statement of Uncontroverted Fact Nos. 7-8, 10]. Plaintiff's joking relationship with Newland, however, seemed to be reciprocal.  The record also shows that in March 2004, plaintiff asked for time off to take his pregnant wife to her ultrasound. In response to Newland's directive to put the request in writing, plaintiff sent him an e-mail that stated: "I ALREADY HAD APPROVAL FROM RUSCH TO TAKE AN EXTENDED LUNCH. THIS IS THE DAY MY WIFE WILL HAVE HER ULTRA-SOUND ON THE BABY???????? IT BETTER NOT SHOW A GOAT TEE AND BLONDE SPIKED HAIR [a reference to Newland's appearance]........WE'LL REALLY NEED TO TALK........HA.HA" [Doc. No. 67, Statement No. 33; Doc. No. 73, Statement No. 33].

8

73, Statement No. 38 and Statement of Uncontroverted Fact No. 14].[9] Plaintiff also alleges that Dickson walked around plaintiff's desk and made the "Black Power" salute, saying, "Keep it real, black power." [Doc. No. 73, Statements of Uncontroverted Fact Nos. 11, 13]. Plaintiff complained about this, and was moved to a desk directly below the security camera so "he would know he was being watched." [*Id.,* Statement of Uncontroverted Fact No. 12].

In the fall of 2004, URS changed its organizational structure from a corporation to a limited partnership and, as part of the change, adopted a new employee handbook. URS required all employees to sign an acknowledgment form that they received and agreed to abide by the handbook. [Doc. No. 67, Statement No. 40; Doc. No. 73, Statement No. 40]. Plaintiff refused to sign the handbook and, on October 8, 2004, forwarded a complaint to McCann that Dickson was forcing him to sign and agree to a new employee handbook. [Doc. No. 67, Statement No. 41; Doc. No. 73, Statement No. 40]. McCann investigated plaintiff's complaint and, as all employees were required to sign the handbook, found no merit in plaintiff's allegations. [Doc. No. 67, Statement No. 42; Doc. No. 73, Statement No. 42].

On June 15, 2004, plaintiff and his wife filed a Chapter 13 Voluntary Petition for Bankruptcy in the United States Bankruptcy Court for the Northern District of Oklahoma, Bankruptcy Petition No. 04-13433-M. [Doc. No. 67, Statement No. 43]. Plaintiff did not list his administrative claim against URS as an asset in the Schedule of Personal Property (Schedule B) filed in the Bankruptcy Court, or list the claim in response to Question Four of the Statement of

---

[9]The court admits to some perplexity about this term, having believed it to be short for "hoodlums," which is not a racial term. However, upon review of the Urban Dictionary, it appears that the term has evolved and now has a number of possible meanings, including "someone who is from the ghetto."

9

Financial Affairs" filed in the Bankruptcy Court. [Doc. No. 67, Statement Nos. 44-45]. The Chapter 13 case was dismissed on February 16, 2005. [Doc. No. 67, Ex. X., Dkt. #68; Doc. No. 78].

### III.  Analysis

### A.  Judicial Estoppel

Defendant contends that plaintiff should be judicially estopped from asserting his employment discrimination claims in this case because he failed to disclose them to the Bankruptcy Court in his Chapter 13 voluntary bankruptcy petition filed June 15, 2004. The doctrine of judicial estoppel was first recognized in *New Hampshire v. Maine,* 532 U.S. 742 (2001). The purpose of the doctrine is "to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Id.* at 749-50. The rule is intended to prevent improper use of judicial machinery. *Id.* at 750. Three factors "typically inform the decision whether to apply the doctrine in a particular case." *Id.* First, a party's subsequent position must be clearly inconsistent with its former position. *Id.* Second, a court should inquire whether the suspect party succeeded in persuading a court to accept the party's former position, "so that judicial acceptance of an inconsistent position in a later proceeding would create the *perception* that either the first or the second court was misled." *Id.* Finally, the court should inquire whether the party seeking to assert an inconsistent position would gain an unfair advantage in the litigation if not estopped. *Id.* at 751.

In *Eastman v. Union Pacific Railroad Company,* 493 F.3d 1151 (10th Cir. 2007), the court expounded on the rationale for judicial estoppel:

> A debtor, once he files for bankruptcy, disrupts the flow of commerce and promptly benefits from an automatic stay. The debtor then receives

10

> the ultimate benefit of bankruptcy when he receives a discharge. A
> chapter 7 discharge...relieves the debtor of any obligation to pay outstanding
> debts. This in the aggregate drives up interest rates and harms credit-worthy
> borrowers.

*Id.* at 1159 (citations omitted).

Here, however, plaintiff's chapter 13 voluntary bankruptcy was dismissed rather than discharged. The claims of the creditors were not, as a result of the action, compromised or diminished. Neither the second nor third prongs of the inquiry mandated in *New Hampshire* are met. Therefore, application of the doctrine of judicial estoppel is inappropriate in this case.

### B. Plaintiff's Racial Harassment Claims

Hostile work environment is not explicitly mentioned in Title VII. However, it is well established that a victim of a racially hostile or abusive work environment may bring a cause of action pursuant to 42 U.S.C. §20003-2(a)(1). *Bolden v. PRC, Inc.,* 43 F.3d 545, 550 (10th Cir. 1995). To constitute actionable harassment, the conduct must be "sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Id.* at 550-51 (citations omitted). An employer who does not actively engage in the harassment may nonetheless be liable under agency principles. *Id.*

To survive summary judgment on the hostile work environment claim, plaintiff must demonstrate that "a rational jury could conclude that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Jones v. Barnhart,* 349 F.3d 1260, 1268 (10th Cir. 2003). This requires plaintiff to assert more than a few isolated incidents of racial enmity. *Id.* Courts attempting to determine whether the environment was hostile must examine all of the circumstances alleged including the frequency

11

of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Id.* The environment complained of must be evaluated both objectively and subjectively. *McCowan v. All Star Maintenance,* 273 F.3d 917, 923 (10th Cir. 2001). The environment must be one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive it to be. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998).

Put another way, for plaintiff's harassment claim to survive summary judgment, his facts must support both the inference of a racially hostile environment and a basis for liability. *Bolden* at 51. Specifically, it must be shown that under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privileges of employment and (2) the harassment was racial or stemmed from racial animus. *Id.* Instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments. *Id.*

The court, having examined the record, concludes plaintiff has not met his burden. First, the court is unpersuaded that, with respect to at least some of the behavior, plaintiff subjectively found it to be hostile or abusive, as evidenced by the fact that plaintiff actively engaged in similar behavior himself, particularly with his co-worker, Perkins. Plaintiff's failure to report Perkins' behavior provides further support for this conclusion. Second, the court does not believe the alleged conduct was pervasive. Plaintiff worked at URS for three years. The record indicates plaintiff was well-liked and routinely participated in an exchange of barbs, practical jokes and kidding that might be considered, at times, to be something less than tasteful in nature. The alleged offensive behavior began in 2004 and consisted of the comments by Perkins (largely reciprocated by plaintiff); the telling of racial jokes by Newland, for which Newland was

suspended; a comment by Dickson about the "hoods" complaint made by a third party; and, allegedly, the "Black Power" statement and gesture by Dickson.[10]  Applying *Bolden*, the court finds that under the circumstances, the conduct was neither severe nor pervasive enough to alter the terms, conditions or privileges of plaintiff's employment.

Furthermore, URS has a defense to liability because, to the extent plaintiff reported incidents, URS investigated and attempted to resolve the complaints. The Tenth Circuit has identified three alternative bases drawn from agency principles for holding an employer liable for hostile work environment harassment: (1) where the acts are committed by an employee acting "within the scope of [his or her] employment;" (2) where the employer was negligent or reckless; or (3) where the employee purported to act or speak on behalf of the employer and there was reliance upon apparent authority, or the harasser was aided by the agency relation. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 673 (10th Cir. 1998).  Plaintiff never complained about Perkins' behavior to URS.  An employer is only obligated to respond to harassment of which it actually knew, or in the exercise of reasonable care should have known. *Id.*  When plaintiff complained about Newland's conduct, McCann investigated the complaint and, as a result, Newland was suspended without pay for three days.  Plaintiff testified Newland made no more racial comments after that time.  When plaintiff complained about the employee handbook acknowledgment and Dickson's "hoods" and "Black Power" comments, and McCann investigated those complaints,   providing an "investigative recap" to plaintiff on October 29, 2004, and an e-mail on November 3, 2003, concerning his investigation.  [Doc. No. 67, Ex. V.,

---

[10]Plaintiff also complains that Dickson attempted to make him sign an acknowledgment that he had received and reviewed  the new employee handbook.  All employees were required to sign this acknowledgment.  There appears to be no racial component to this complaint.

13

¶14] .

Thus, the court concludes defendant is entitled to summary judgment on plaintiff's racial harassment claim.

### C.  Plaintiff's Racial Discrimination Claims

The burden-shifting framework pronounced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973), guides analysis of plaintiff's Title VII racial discrimination claim. *Rivera v. City and County of Denver,* 108 F.3d  912, 920 (10th Cir. 2004).  Under this framework, plaintiff must initially establish a prima facie case of discrimination.  *Id.*  If the plaintiff establishes a prima facie case, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for its action.  *Id.,* citing *McDonnell Douglas* at 802.  If the defendant comes forward with a nondiscriminatory reason for its actions, then the burden reverts to the plaintiff to show that "there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual–i.e., unworthy of belief." *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir. 1997).

To establish a prima facie case of discriminatory discharge based on national origin, plaintiff must show that (1) he belongs to a protected class; (2) he suffered an adverse employment action, and (3) the adverse employment action occurred under circumstances which give rise to an inference of discrimination.

Plaintiff meets the first two requirements: he is African American and he was discharged from his job.  With respect to the third element, plaintiff appears to argue that racial animus, as demonstrated by the racial slurs and jokes discussed above, was the reason for his discharge.

It is highly questionable whether plaintiff's evidence fulfills the third requirement for

establishment of a prima facie case of racial discrimination. However, assuming, *arguendo,* a prima facie case has been made, the burden would then shift to defendant to articulate a legitimate, nondiscriminatory reason for the discharge. The defendant's burden in the *McDonnell Douglas* burden-shifting context is one of production, not persuasion; it can involve no credibility assessment. *Doubele v. Spring/United Management Company,* 342 F.3d 1117, 1135 (10th Cir. 2003). The Tenth Circuit has described the defendant's burden at this stage of the proceedings as "exceedingly light." *Zamora v. Elite Logistics, Inc.,* 478 F.3d 1160, 1165 (10th Cir. 2007).

Defendant has clearly met the burden to show plaintiff was discharged for a legitimate, non-discriminatory reason. As a result of low production, plaintiff received an Employee Warning Notice on November 17, 2004, advising him that immediate, drastic improvement was required or he would risk further disciplinary actions, up to and including termination. Immediately thereafter, he failed to arrive at work the following Monday, November 22, 2004, or the remainder of the week before the Thanksgiving holiday. The next Wednesday, December 1, 2004, plaintiff failed to show up for his 2:30 p.m. shift. Plaintiff was terminated on December 2, 2004, for absenteeism and lack of production. Poor performance is a "quintessentially legitimate and nondiscriminatory reason for termination." *Bryant v. Farmers Ins. Exchange,* 432 F.3d 1114, 1125 (10th Cir. 2005). Plaintiff has proferred a legitimate, nondiscriminatory reason for the termination.

Thus, the burden shifts back to plaintiff to show the reason was pretextual. Pretext can be shown by "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable

factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reason." *Morgan,* 108 F.3d at 1323.   Where a plaintiff does not dispute the employer's articulated nondiscriminatory reason for dismissal, the employee has failed to prove pretext as a matter of law. *Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209 (10th Cir. 1997).

Plaintiff attempts to show pretext by pointing, once again, to alleged racial animus.  Mere conjecture that an employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment. *Branson v. Price River Coal Co.,* 853 F.2d 768, 772 (10th Cir. 1988).   Plaintiff has admitted he had performance issues.  His evidence simply does not demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" for discharging him that a rational factfinder would find them unworthy of credence.  *Morgan, supra.*

Plaintiff asserts that he would have made his production target in September 2004 "had my production target been reduced proportionately to my reduced hours." [Doc. No. 73, Statement of Uncontroverted Fact No. ¶17.] .  However,  "the defendant does not at this stage of the proceedings need to litigate the merits of the reasoning, nor does it need to prove that the reason relied on was bona fide." *Panis v. Mission Hills Bank, N.A.,* 60 F.3d at1491, citing *E.E.O.C. v. Flasher CO., Inc.,* 986 F.2d 1312, 1216 (10th Cir. 1992).  The relevant inquiry is whether the employer's stated reasons were held in good faith at the time of the discharge, even if they later prove to be untrue, or whether plaintiff can show that the employer's explanation was so weak, implausible, inconsistent or incoherent that a reasonable fact finder could conclude that it was not an honestly held belief but rather was subterfuge for discrimination. *Young v.*

*Dillon Companies, Inc.,* 468 F. 3d 1243, 1250 (10th Cir. 2006).   The court's role "is to prevent intentional discriminatory...practices, not to act as a 'super personnel department.'" *Id.*

Plaintiff has failed to demonstrate a genuine dispute of material fact as to whether the employer's proffered reason for discharging him was pretextual, i.e., unworthy of belief. *Morgan,* 108 F.3d at 1323.  Therefore, defendant is entitled to summary judgment on plaintiff's race discrimination claim.

### D.  Plaintiff's Retaliation Claim

The burden-shifting framework pronounced in *McDonnell Douglas Corp. v. Green* also guides review of plaintiff's retaliatory discharge claim. *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997).  In the summary judgment context, plaintiff must initially raise a genuine issue of material fact on each element of the prima facie case. *Id.*  To establish a prima facie case, plaintiff must show (1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action. *Haynes v. Level 3 Communications, LLC,* 456 F.3d 1215, 1228 (10th Cir. 2006).

Plaintiff appears to establish the first two elements of a prima facie case of retaliatory discharge in that (1)   he made internal complaints of harassment and filed an EEOC charge against defendant and (2) he was discharged from employment.  Again, the court questions whether plaintiff has come forward with any evidence of a causal connection.  However, assuming he has, the burden then shifts–as with the racial discrimination claim–to the employer to offer a legitimate, non-discriminatory reason for the termination.  Again, the burden is one of production, not persuasion. *Doubele* at 1135.  Defendant offered evidence plaintiff was

terminated for lack of productivity and absenteeism.  Thus, it has met its burden.

The burden shifts back, then, to plaintiff to show that the proferred legitimate reason for the firing was pretextual.  As with his race discrimination claim, plaintiff has failed to offer any evidence controverting defendant's stated reason for the termination.  Plaintiff, in his affidavit, states "I was reduced from collecting "A" filed [*sic*] down to collecting "B" files, about when I began to complain about racism in the workplace." [Doc. No. 73, Plaintiff's Affidavit, ¶4].  However, as noted earlier, the reallocation of files occurred *before* plaintiff ever complained about racial harassment.

Plaintiff has not produced evidence the firing was pretextual.  Therefore, defendant is entitled to summary judgment on plaintiff's retaliatory discharge claim.

### IV.  Conclusion

For the reasons set forth above, defendant's motion for summary judgment [Doc. No. 67] is granted.

ENTERED this 3rd day of February, 2009.

Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma